IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ENZO DI LORETO,  ) | Case No. 1:20-cv-00098-JPC |
| ) | |
| Plaintiff,  ) | JUDGE J. PHILIP CALABRESE |
| ) | |
| v.  ) | MAGISTRATE JUDGE |
| ) | CARMEN E. HENDERSON |
| ANDREW SAUL,  ) | |
| COMMISSIONER OF SOCIAL SECURITY,  ) | |
| ) | REPORT AND RECOMMENDATION |
| Defendant,  ) | |

## I.       Introduction

Plaintiff, Enzo Di Loreto, seeks judicial review of the Commissioner of Social Security's decision denying his disability-insurance-benefits application. This matter is before me under 42 U.S.C. §§ 405(g), 1383(c)(3) and Local Rule 72.2(b). Because the ALJ followed proper procedures and his decision is supported by substantial evidence, I recommend that the Commissioner's final decision be AFFIRMED.

## II.      Procedural History

Di Loreto filed for disability insurance benefits on October 15, 2016, alleging a disability period that began on December 24, 2014. (ECF No. 11 at 17). The Ohio Division of Disability Determination (the "State Agency") initially denied his claim on December 20, 2016, and denied it again at the reconsideration stage on June 15, 2017. (ECF No. 11 at 17). Di Loreto then requested a hearing before an ALJ. (ECF No. 11 at 17). ALJ Joseph Hajjar presided over Di Loreto's hearing on October 17, 2018. (ECF No. 11 at 17). Di Loreto appeared with counsel and testified (with the help of an interpreter). (ECF No. 11 at 17, 70-92). Mark Anderson testified via telephone as an

1

impartial vocational expert. (ECF No. 11 at 17, 92-97). The ALJ issued his decision on January

28, 2019. (ECF No. 11 at 14-40). He determined that Di Loreto was not disabled under the Social

Security Act. (ECF No. 11 at 14-40). Di Loreto asked the Appeals Council to review and set aside

the ALJ's ruling, but the Appeals Council denied his request on December 10, 2019. (ECF No. 11

at 5-8). Thus, Di Loreto's administrative decision was final as of that date. This timely appeal

followed. (ECF No. 1).

## III.    Background

Di Loreto does not allege that the ALJ failed to include material facts or parsed the record;

therefore, the ALJ's factual, testimonial, and opinion summaries suffice for this case.

### A.    Relevant Written Submission and Hearing Testimony

> With the help of his wife, the claimant reported that he did not have
> full range of motion in the arms; he is difficulty lifting and pushing
> or pulling anything heavy (3E/5); he has no issues with personal
> care, aside from putting on and taking off coats; he cares for his pets
> (3E/6); he does not need special reminders for personal care or to
> take medication; he is able to prepare his own meals weekly; he
> takes care of laundry; his spouse does the other household chores
> and yard work (3E/7); he gets around daily by driving a car; he is
> able to go out alone; he is able to shop in stores for food once per
> week; he is able to count change; his spouse handles the finances
> (3E/8); he has difficulty lifting more than 20 pounds; he has
> difficulty squatting, and reaching; he is able to walk a mile before
> he needs to rest for 20 minutes; he is able to pay attention, depending
> on whether he is interested; he finishes what he starts; he follows
> written instructions fairly; he needs spoken instructions repeated a
> few times (3E/9); he spends time with others one time per week with
> activities such as watching television and playing cards; he goes to
> the Italian social club; he does not need reminders to go places; he
> does not need someone to accompany him when he goes out
> (3E/10); he gets along very well with authority figures; he has never
> been laid off or fired because of problems getting along with others;
> he handles changes in routine well; he uses a back brace/splint
> nightly; and he uses hearing aids daily (3E/11). He made similar
> allegations in a function report dated March 1 2017, with the
> assistance of his wife. (6E).

2

The claimant testified that he is unable to work because of injuries to his knee shoulders, back, and neck; he received a cortisone shot in his right knee 3-4 weeks ago, and he felt a little better; physical therapy was helpful for his shoulders, but he did not regain 100% use of his shoulders; he has difficulty tying his shoes, picking up bags; his doctor limited him to lifting 2 pounds; he has had no treatment for his [carpal tunnel syndrome], other than wearing splints at night; he goes to the Italian club to play cards with people and watch television; he likes to cook at home with his wife; he attends aqua therapy on Thursdays; he drops his coffee cup at times due to pain and numbness in his hands; he uses a grabber to help pick up items off the floor; his knees are bad and he is unable to bend over too much; he is able to put his arms over his heads, but he has more difficulty with the right; and he has no difficulty reaching out in front. (Testimony).

(ECF No. 11 at 30-31).

## B.   Relevant Medical Evidence

The record supports that the claimant has experienced functional limitations related to degenerative joint disease of both shoulders, disorders of the lumbar and cervical spine, and [carpal tunnel syndrome]. A nerve conduction study dated February 2, 2015, showed normal ulnar and radial nerve conduction, and no evidence of cervical radiculopathy. (2F/8-10 and 3F/13-15). X-ray of the claimant's cervical spine dated February 6, 2015, showed slight retrolisthesis at C4-5, related to mild degenerative disc disease; and mild disc narrowing at C5-6 and C6-7, with discogenic endplate changes and some uncinated spurring. (3F/24). The claimant received bilateral C4-6 para-spinal injections of Depo-Medrol and lidocaine on February 10, 2015. (3F/19).

On March 18, 2015, the claimant reported right shoulder pain over the past year, aggravated with overhead activities; he noted limited range of motion; and he did not experience much relief from NSAIDS. (2F/11). On exam, he was well developed and well-nourished; he was in no acute distress; his right shoulder range of motion was slightly reduced; his right AC joint was non-tender; he had 4/5 rotator cuff strength on the right shoulder, with 5/5 strength on the left shoulder; and he was otherwise unremarkable throughout, including full range of motion, no muscle atrophy, no weakness, and intact sensation to superficial touch. (2F/11-12). The doctor administered a Marcaine injection in the right shoulder. (2F/12) The doctor noted the diagnoses of glenohumeral arthritis with asymptomatic mild AC arthrosis of the right shoulder, and cervical

disc herniation at C5-7. (2F/13).

MRI of the claimant's left shoulder dated April 30, 2015, showed supraspinatus/infraspinatus, mild tendinosis with intact suture anchor repair to greater tuberosity; AC joint moderate arthrosis; posterior labrum degeneration and tear; and a paralabral cyst distal to the spinoglenoid notch, remodeling the posterior glenoid; and glenohumeral arthrosis, with grade 4 chondral loss superior medial humeral head. (6F/18). MRI of the claimant's right shoulder dated April 16, 2015, showed a large paralabral cyst, arising from a posterior glenoid labral tear; intra-articular long head biceps tendinosis; and mild glenohumeral and acromioclavicular osteoarthrosis. (6F/20-21). At exam on April 23, 2015, he had good range of motion, but he was weak on testing. (6F/11). The claimant underwent an arthroscopy of the right shoulder with decompression of paralabral cyst and labral repair on May 15, 2015. (4F /5). On October 12, 2015, the claimant reported doing well with outpatient physical therapy. (6F/6).

At a visit on October 27, 2016, the claimant's doctor noted that he had not seen the claimant since October of 2015. (7F/6). The claimant presented with complaints of bilateral shoulder pain and numbness in the hands. (7F/6). On exam, he had good range of motion and strength; and he did not have a positive impingement sign. (7F/6).

Nerve conduction testing on January 31, 2017, showed normal ulnar and radial nerve response, and no evidence of cervical radiculopathy. (8F/5-7). X-ray of the claimant's cervical spine dated February 15, 2017, showed lower cervical degenerative changes, without instability. (9F/2). X-ray of the claimant's lumbar spine dated February 15, 2017, showed mild degenerative changes of the lumbar spine without instability. (9F/1). Exam on February 15, 2017, showed he was alert and fully oriented; his coordination was normal; his sensation was intact, with the exception of some hypoesthesia in the tip of the left index finger; his reflexes were intact; his upper and lower extremity strength was intact; his cervical range of motion was reduced; he had moderately reduced range of motion in the right shoulder and mildly reduced range of motion in the left shoulder; and he was otherwise normal throughout. (12F/9).

MRI of the claimant's cervical spine dated February 22, 2017, showed focal foraminal narrowing at C6-7 on the left. (12F/7). After reviewing the imaging, the claimant's doctor recommended physical therapy and continuing conservative management. (12F/5). At a physical therapy evaluation on March 13, 2017, the claimant

4

reported bilateral upper extremity weakness, impaired right shoulder mobility, and difficulty with lifting, pushing, and pulling. (11F/2). On exam, his bilateral shoulder strength with internal and external rotation; he had pronounced tightness and tenderness in the scapular elevators and paraspinal muscles; he was able to sit, stand, pivot, and ambulate independently. (11F/3). The claimant received physical therapy in March and April of 2017. (11F). A progress note dated April 24, 2017, showed improvement in the claimant's cervical and right shoulder active range of motion; only occasional stiffness with cervical rotation; and improved posture and scapular stabilization throughout all activities. (11F/35).

X-ray of the claimant's cervical spine dated April 30, 2018, showed moderate degenerative disc disease at C5-6 and C6-7. (14F/6-7). X-ray of the claimant's lumbar spine dated April 30, 2018, showed no changes in the mild degenerative disc disease from prior imaging from February 15, 2017. (9F/1); (14F/8).

On April 30, 2018, the claimant continued to report pain in his neck, shoulders, and low back. (15F/6). On exam, his gait was normal; his coordination was normal; his sensation was intact throughout; his reflexes were unremarkable; his strength in the upper and lower extremities was normal bilaterally; he had some reduced range of motion in the cervical spine and shoulders; and he was otherwise unremarkable throughout. (15F/6-7).

MRI of the claimant's cervical spine dated June 1, 2018, showed multilevel degenerative changes of the cervical spine, most pronounced at C6-7; and small disc herniation at C5-6 and C4-5, with slight interval progression at C5-6. (16F /3). Nerve conduction testing on September 29, 2018, showed bilateral moderate median latency abnormalities across the carpal tunnel; moderate right ulnar motor velocity slowing across the elbow; and slow digital sensory velocities. (21F/1 and 3)

(ECF No. 11 at 31-33).

### C.    Relevant Opinion Evidence

As for the opinion evidence, the undersigned gives partial weight to the opinions of the state agency medical consultants, Teresita Cruz, M.D., dated December 20, 2016 (1A), and Gail Mutchler, M.D., dated March 29, 2017. (3A). They reviewed the claim at the initial and reconsideration level and opined that the claimant is limited to medium exertion, with frequent bilateral pushing and pulling; never climbing ladders, ropes, or scaffolds; frequent stooping; occasional

crawling; occasional bilateral overhead reaching; and he must avoid even moderate exposure to hazards. (1A/7-9 and 3A/11-13). The undersigned gives partial weight to these opinions, because the more complete record before the undersigned, including the claimant's testimony and more recent treatment notes, supports a greater degree of exertional and non-exertional limitations, as set forth in the above residual functional capacity assessment. Since the doctors did not have the benefit of this more complete record, containing material evidence, their opinions are not as well informed. The portions of their opinions noting some degree of limitation in exertion, climbing, reaching, postural activities, and exposure to hazards, are consistent with the evidence of record, as discussed above. (See e.g., exam findings at 2F/11-12 (his right shoulder range of motion was slightly reduced; and he had 4/5 rotator cuff strength on the right shoulder); 12F/9 (he had some hypoesthesia in the tip of the left index finger; his cervical range of motion was reduced; he had moderately reduced range of motion in the right shoulder; and mildly reduced range of motion in the left shoulder); 11F/35 (he had occasional stiffness with cervical rotation); 15F/6-7 (he had some reduced range of motion in the cervical spine and shoulders)). The claimant's gait was consistently unremarkable throughout the record. (See e.g., 3F/11; 5F; 11F/3, 7, and 33). More recent nerve conduction testing showed evidence of bilateral [carpal tunnel syndrome]. (See 21F/1 and 3). In sum, this evidence supports a greater degree of functional limitation than the doctors found. Accordingly, the undersigned gives partial weight to their opinions…

The undersigned construed the assertions of the claimant's wife, Rita Di Loreto, as set forth in the function reports of record as those of the claimant, based on the nature of the responses she provided in those reports. (See 3E and 6E). She appears to have assisted the claimant in filling them out based on his English language difficulties. To the extent these reports are construed as Mrs. Di Loreto's opinions and observations, the undersigned gives them only partial weight, because only portions are consistent with the medical evidence of record, as explained in the discussion of the Allegation Analysis above. Moreover, the observations and opinions provided by Mrs. Di Loreto do not establish that the claimant is disabled. Since she is not medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms, the accuracy of the observations and opinions is questionable. Moreover, by virtue of the relationship as the claimant's wife, the witness cannot be considered a disinterested third party witness whose representations would not tend to be

6

colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges. Accordingly, the undersigned gives only partial weight to Mrs. Di Loreto's opinions and observations.

(ECF No. 11 at 36-37).

## IV.  The ALJ's Decision

As is relevant and helpful here, the ALJ issued the following findings of fact and narrative analysis:

> 3.    The claimant has the following severe impairments: dysfunction of major joints; spine disorders; and carpal tunnel syndrome…
>
> 4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix…
>
> 5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can frequently push and/or pull with the bilateral upper extremities; he can operate hand controls frequently, bilaterally; he can occasionally reach overhead bilaterally; he can frequently handle, finger, and feel bilaterally; he can never climb ladders, ropes, or scaffolds; he can stoop, kneel, and crawl occasionally; he can crouch frequently; he can never work at unprotected heights; he can never work with moving mechanical parts; and he can perform no commercial driving.
>
> In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527…
>
> As to physical impairments, the claimant's allegations of disabling physical limitations related to his neck, back, and shoulders, are not entirely consistent with the medical evidence of record. The claimant's allegations of knee pain related to degenerative joint disease of the knee do not meet the durational requirement to establish the condition as a severe impairment, and the claimant

reported good relief from injections. (Testimony and Finding 3). While the record supports some degree of physical dysfunction the claimant alleged from the aforementioned severe impairments, the record does not support that the claimant has experienced a disabling degree of functional limitation related to them.

The imaging of record and testing shows degenerative disc disease, including disc narrowing, herniation, spurring, and degenerative changes in the claimant's cervical and lumbar spine, degenerative changes in the claimant's shoulders, and some moderate median latency related to [carpal tunnel syndrome] in his wrists; however, aside from some reduced range of motion and pain in the shoulders, back and neck, and slight sensation loss related to [carpal tunnel syndrome], the claimant's physical examination findings of record showed he otherwise retained full strength, range of motion, sensation, gait, coordination, and reflexes throughout. For example, at exam on March 18, 2015, his right shoulder range of motion was slightly reduced; his right AC joint was nontender; he had 4/5 rotator cuff strength on the right shoulder, with 5/5 strength on the left shoulder; and he was otherwise unremarkable throughout, including full range of motion, no muscle atrophy, no weakness, and intact sensation to superficial touch. (2F/11-12). The claimant did not have treatment for approximately one year related to his back or shoulders from October 2015 to October 2016. At exam on October 27, 2016, he had good range of motion and strength; and he did not have a positive impingement sign. (7F/6). At exam on February 15, 2017, his coordination was normal; his sensation was intact, with the exception of some hypoesthesia in the tip of the left index finger; his reflexes were intact; his upper and lower extremity strength was intact; his cervical range of motion was reduced; he had moderately reduced range of motion in the right shoulder and mildly reduced range of motion in the left shoulder; and he was otherwise normal throughout. (12F/9). A physical therapy progress note dated April 24, 2017, he showed improvement in the claimant's cervical and right shoulder active range of motion; only occasional stiffness with cervical rotation; and improved posture and scapular stabilization throughout all activities. (11F /35). At exam on April 30, 2018, his gait was normal; his coordination was normal; his sensation was intact throughout; his reflexes were unremarkable; his strength in the upper and lower extremities was normal bilaterally; he had some reduced range of motion in the cervical spine and shoulders; and he was otherwise unremarkable throughout. (15F/6-7)…

After reviewing the medical evidence of record at the initial and reconsideration level, the state agency medical consultants opined that the claimant is limited to medium exertion, with frequent

bilateral pushing and pulling; never climbing ladders, ropes, or scaffolds; frequent stooping; occasional crawling; occasional bilateral overhead reaching; and he must avoid even moderate exposure to hazards. (1A/7-9 and 3A/11-13). There are no medical opinions of record suggesting a greater degree of physical limitation; however, the undersigned has given deference to the claimant's allegations of pain and the more recent treatment notes, to find a greater degree of exertional and non-exertional limitations, as noted above in the residual functional capacity assessment. In sum, the claimant's allegations of disabling physical limitations are not entirely consistent with the medical evidence of record. While the record does not entirely support the extent of limitations the claimant has alleged, the record supports some degree of limitation from the claimant's impairments…

6.      The claimant is unable to perform any past relevant work…

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform…

11.     The claimant has not been under a disability, as defined in the Social Security Act, from December 24, 2014, through the date of this decision…

(ECF No. 11 at 19-39).

## V. Law & Analysis

### A.      Standard of Review

The court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence. 42 U.S.C. § 405(g); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is "more than a scintilla" of relevant evidence; a reasonable person "might accept [it] as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard of review, if the Commissioner's findings as to any fact are supported by substantial evidence, then those findings are conclusive. 42 U.S.C. § 405(g); *see Jones v.*

*Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor when testifying."). Put another way, a court cannot decide the facts anew, make credibility determinations, or re-weigh the evidence. The decisive question is whether the ALJ's conclusions are "substantially supported in the record." *Rogers*, 486 F.3d at 241. If so, then the court must affirm the Commissioner's findings, even if the court does not agree with the Commissioner's decision or substantial evidence exists to support an alternative result. *Elam*, 348 F.3d at 125 ("The decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without the court second guessing him. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Despite this deference, a court will not uphold the Commissioner's decision if the ALJ failed to apply proper legal standards—*i.e.*, "fails to follow its own regulations"—unless the error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006). An error causes harm if it "prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* The court will not remand a case for further administrative proceedings absent prejudice on the merits or a deprivation of substantial procedural rights. *Rabbers v. Comm'r Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009). Similarly, if the ALJ failed to "build an accurate and logical bridge between the evidence and the result," then the court cannot uphold the ALJ's decision, even one supported by substantial evidence. *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (citing *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)). This and other 6th Circuit District

Courts follow *Sarchet*'s logical-bridge requirement[1] because it ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.    Discussion

Di Loreto raises one broad issue: "Whether the ALJ erred by misinterpreting medical evidence when assigning the claimant's [RFC]." (ECF No. 13 at 11-16 (styling adjusted)). Di Loreto's appeal turns on the ALJ's decision to conclude that Di Loreto was capable of light work, despite the State Agency consultants' opinions that Di Loreto was capable of medium work. (ECF No. 11 at 36).

Di Loreto objects to the ALJ's analysis in two distinctive yet interconnected ways. First,

---

[1] *E.g. Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

Di Loreto asserts that the ALJ improperly interpreted the medical evidence in fashioning Di Loreto's RFC. (ECF No. 13 at 13). As Di Loreto sees it, the ALJ did more than consider and assess the medical record: The ALJ made "medical judgments," which ALJs are not permitted to do. (ECF No. 13 at 13). Di Loreto supports this by stating that the "ALJ d[id] not identify evidence that demonstrates that [Di Loreto] could perform at a light level." (ECF No. 13 at 13-14). Second, Di Loreto asserts that the ALJ had a duty to "order[] a consultative examination or issu[e] an interrogatory to a medical professional" after rejecting the State Agency's physical consultants' opinions concerning medium work. (ECF No. 13 at 13). Di Loreto argues that this demonstrates that the ALJ failed to fully develop the administrative record, as the record would have benefitted from "an accurate, up to date, expert opinion regarding Mr. Di Loreto's [RFC]." (ECF No. 13 at 16).

The Commissioner disagrees. In his view, the ALJ reasonably developed the administrative record and fashioned Di Loreto's RFC in light of the medical evidence before him, which is the Commissioner's province alone. (ECF No. 15 at 11). And the Commissioner asserts that the record "contains sufficient evidence to support the agency's factual determinations." (ECF No. 15 at 10-11 (internal quotations omitted)).

For the following reasons, the Court agrees with the Commissioner in both instances.

### 1.    Interpreting the Medical Evidence

Di Loreto asserts that the ALJ "assign[ed] Mr. Di Loreto a [RFC] based on [the ALJ's] own interpretation of the medical evidence." (ECF No. 13 at 13; *see also* at 15 ("Rather than being based on a doctor's opinion, Mr. Di Loreto's assigned [RFC] is based on [the] ALJ['s] own interpretation of medical data.")). Di Loreto believes that the ALJ "exceeded [his] role as an adjudicator" in rendering such a decision. (ECF No. 13 at 13). The Commissioner responds by

saying that "an RFC determination is a legal decision rather than a medical one, and the development of a claimant's RFC is solely within the province of an ALJ." (ECF No. 15 at 11). Thus, the Commissioner asserts that the ALJ followed proper procedures, as he merely considered and assessed Di Loreto's work-related capabilities in fashioning Di Loreto's RFC. (ECF No. 15 at 11). The Court agrees with the Commissioner.

During the sequential evaluation process, an ALJ must identify the claimant's RFC, which "is the most [the claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). The RFC denotes "functional limitations and restrictions and … [the claimant's] remaining capacities for work-related activities." Soc. Sec. Ruling 96-08p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). The ALJ must "assess[] 'an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.'" *Stewart v. Comm'r of Soc. Sec.*, 881 F. App'x 349, 355 (6th Cir. 2020) (quoting SSR 96-8p, at *1). The ALJ must "consider [claimant's] ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(b)(4); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir.2009).

A RFC determination is a legal finding, not a medical determination; thus, an "ALJ—not a physician—ultimately determines a claimant's RFC." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010) (citing 42 U.S.C. § 423(d)(5)(B)); *see also Nejat*, 359 F. App'x at 578 ("Although physicians opine on a claimant's residual functional capacity to work, [the] ultimate responsibility for capacity-to-work determinations belongs to the Commissioner."); 20 C.F.R. § 404.1546(c) ("[T]he administrative law judge … is responsible for assessing your residual functional capacity."). In doing so, the ALJ evaluates, rather than interprets, the medical evidence and the claimant's testimony. *Coldiron*, 391 F. App'x at 439.

Of course, the "ALJ may not make medical judgments" in fashioning an RFC. *Meece v.*

13

*Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006). But "[a]n ALJ does not improperly assume the role of a medical expert by [merely] weighing the medical and non-medical evidence before rendering an RFC finding." *Id.* (citing *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir.2009)). Similarly, "[a]lthough the ALJ may not substitute his opinion for that of a physician" in fashioning an RFC, the ALJ "is not required to recite the medical opinion of a physician verbatim in his [RFC] finding." *Poe*, 342 F. App'x at 157 (citing 20 C.F.R. § 404.1545(a)(3)).

*Meece*—which Di Loreto cites in support of his argument—illustrates the difference between assessing a claim under the discussed-above regulatory framework and improperly judging a medical record as a physician would. In *Meece*, "the ALJ discounted the extent of [the p]laintiff's headache pain due to the fact that [the p]laintiff's doctors [had] failed to prescribe" certain pain medicine for the plaintiff's headaches. *Id.* Because the ALJ expected that a physician would have prescribed headache medication for such severe headache symptoms—which the treating physician did not do for Meece—the ALJ discredited (in part) the plaintiff's pain-levels testimony. *Id.* The Sixth Circuit concluded that the ALJ's headache-medication analysis was improper, noting that the ALJ had "substitute[d the ALJ's] own medical judgment for that of the treating physician [on proper or necessary medication] where the opinion of the treating physician is supported by the medical evidence." *Id.* The Sixth Circuit further explained that, "[w]hile the ALJ may have prescribed different pain medication than that prescribed by Plaintiff's doctors, this decision is beyond the expertise of the ALJ and is not a legitimate basis for an adverse credibility determination." *Id.*

Di Loreto does not directly assert that the ALJ overrode or interpreted any specific medical evidence. The Court has not independently discovered it, either. Instead, Di Loreto states that "none of th[e] medical evidence [that the ALJ notes in his narrative explains] … why Mr. Di Loreto

would be able to lift the amount of weight determined by the decision, or why the use of his arms was limited to the extent determined by [the] ALJ…" (ECF No. 13 at 15). That conclusory statement speaks to the ALJ assessing Di Loreto's RFC in light of the available evidence, rather than to interpreting medical evidence as a physician would. Accordingly, the Court concludes that the ALJ did not make medical judgments; as discussed further below, the ALJ merely assessed the medical evidence in fashioning Di Loreto's RFC.

Di Loreto separately implies that the ALJ erred in relying on the evidence in the record because, as he sees it, the same evidence also could support a sedentary finding. (ECF No. 13 at 15 ("[T]he decision could have recited the same exact evidence[] but found that Mr. Di Loreto was limited to sedentary work[] or only occasional pushing, pulling, fingering, and feeling with his upper extremities."). This, too, is an assessment-of-the-evidence objection. In such circumstances, the ALJ enjoys a "zone of choice" within which to decide close evidentiary and credibility calls. *Mullen*, 800 F.2d at 538. Thus, the only question before the Court is whether the ALJ's light-work finding is supported by substantial evidence and logically drawn. *See Elam*, 348 F.3d at 125 ("The decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *see also Fleischer*, 774 F. Supp. 2d at 877 (noting that the ALJ must "build an accurate and logical bridge between the evidence and the result").

The Court concludes that it is. The regulations "classify jobs as sedentary, light, medium, heavy, and very heavy" exertional-level work. 20 C.F.R. § 404.1567. Only sedentary, light, and medium exertional levels are relevant here. They are defined as follows:

> (a) Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking

15

and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) Medium work. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work.

20 C.F.R. § 404.1567(a-c). Here, the ALJ found that Di Loreto can "perform light work … except he can frequently push and/or pull with the bilateral upper extremities; he can operate hand controls frequently, bilaterally; he can occasionally reach overhead bilaterally; he can frequently handle, finger, and feel bilaterally…" (ECF No. 11 at 30).

Di Loreto objects to the ALJ's analysis and explanation of Di Loreto's ability to use his upper extremities. (ECF No. 13 at 14-15). Early in the decision, the ALJ noted that Di Loreto (through his wife) submitted evidence that he "has difficulty lifting more than 20 pounds." (ECF No. 11 at 30 (citing exhibit 3E at 9)). And the ALJ noted that the record indicates that Di Loreto has a moderately or mildly reduced range of motion in both shoulders. (ECF No. 11 at 35). He also noted that Di Loreto, after receiving treatment in 2015, first sought additional shoulder treatment over a year later. (ECF No. 11 at 35). Moreover, he notes that Di Loreto's shoulder range of motion improved somewhat during physical therapy sessions in 2017 and that, in 2018, Di Loreto's "sensation was intact throughout; his reflexes were unremarkable; his strength in the upper and

16

lower extremities was normal bilaterally; he had some reduced range of motion in the cervical spine and shoulders; and he was otherwise unremarkable throughout." (ECF No. 11 at 35). That evidence substantially supports a light-work finding, as Di Loreto can admittedly lift or carry objects weighing up to ten pounds frequently and less than twenty pounds overall, and is only moderately or mildly limited in his shoulder pain and range of motion.

The ALJ also noted that he gave deference to Di Loreto's subjective statements about his pain and the recent medical records that discussed his pain, too. (ECF No. 11 at 35). The ALJ noted that he "exercise[ed] an abundance of caution"—he gave Di Loreto the benefit of the doubt—in finding that Di Loreto was capable of only light work. (ECF No. 11 at 35-36 ("While [Di Loreto]'s physical examinations findings showed [that] he retained full strength throughout, the [ALJ] has given deference to [Di Loreto]'s allegations of pain [and] balanced [them] against the medical evidence…"). Although the State Agency physical consultants opined that Di Loreto was capable of medium work, substantial evidence supports the ALJ's finding that light work is the most that Di Loreto can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1).

Even if that evidence could support a sedentary-work finding, the Court must affirm the ALJ's reasonably drawn and logical findings here because they are supported by substantial evidence. *Elam*, 348 F.3d at 125. Accordingly, the Court should not disturb the ALJ's light-work finding.

### 2.    Developing the Medical Record

Di Loreto alternatively asserts that the ALJ "had an affirmative duty to order a consultative examination or issue interrogatories to a medical expert," *i.e.*, that the record did not contain enough medical evidence to fashion Di Loreto's RFC. (ECF No. 13 at 16). The Commissioner disagrees, noting that an ALJ "has discretion to determine whether additional evidence is

necessary" to adjudicate a claim and that, on this record, the ALJ acted reasonably in proceeding to adjudicate Di Loreto's claim. (ECF No. 15 at 10). The Court again agrees with the Commissioner.

As an initial point, a claimant must "prove … that [he is] blind or disabled. [He] must inform [the Commissioner] about or submit all evidence known to [him] that relates to whether or not [he is] blind or disabled…" 20 C.F.R. § 404.1512(a)(1); *see also Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir.1986) ("The burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant."). Relatedly, the regulations obligate the Commissioner to "develop [the claimant's] complete medical history for at least the 12 months preceding the month in which you file your application…" 20 C.F.R. § 404.1512(b)(1).

But the regulations do not compel an ALJ to order a consultative examination or issue interrogatories:

> We may ask you to attend one or more consultative examinations at our expense… Generally, we will not request a consultative examination until we have made every reasonable effort to obtain evidence from your own medical sources. We may order a consultative examination while awaiting receipt of medical source evidence in some instances, such as when we know a source is not productive, is uncooperative, or is unable to provide certain tests or procedures.

20 C.F.R. §§ 404.1512(b)(2).

Neither does Sixth Circuit case law: "[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination." *Landsaw*, 803 F.2d at 214; *Welton v. Comm'r of Soc. Sec. Admin.*, Case No. 5:11-cv-0104, 2012 WL 43052, at *12 (N.D. Ohio Jan. 9, 2012). The regulations merely vest in the ALJ the discretion to seek additional

18

consultative evidence if the claim so dictates.

While the regulations obligate the ALJ to fully develop the medical record, "an ALJ has a special, *heightened* duty to develop the record" in certain circumstances, such as when "a claimant is (1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures." *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x. 456, 459 (6th Cir.2008) (citing *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1051-52 (6th Cir.1983)) (emphasis added). But the Sixth Circuit "repeatedly affirms that the claimant bears the ultimate burden of proving disability" when those circumstances are not present. *Wilson*, 280 F. App'x. at 459

This is not a special-duty case. While Di Loreto has limited English proficiency, he was represented by counsel at his hearing and an interpreter assisted him. (*See* ECF No. 11 at 70-92). And Di Loreto's counsel agreed that the record was complete and accurate at the time of the hearing. (ECF No. 11 at 72 ("I believe at this point we have everything [in the record], Your Honor.")). Finally, the ALJ elicited Di Loreto's testimony and gave Di Loreto's counsel the same opportunity. (ECF No. 11 at 74-91). In short, Di Loreto had a full and fair opportunity to develop the testimonial record.

*Simpson v. Comm'r. of Soc. Sec.*, which the Commissioner cites, explains what a fully developed medical record entails in most cases:

> In *Allison v. Apfel*, a case in which the claimant was without counsel, this Court held that the record was fully developed, where the claimant himself was the only one who testified at the hearing before the ALJ, and the record contained reports from two psychologists and a psychiatrist. 2000 WL 1276950, at *5, at *17 (6th Cir.2000); see also *Kendrick v. Shalala*, 998 F.2d 455, 456-58 (7th Cir. 1993) (noting that a record is never really complete but "taking 'complete record' literally would be a formula for paralysis, undermining all of the objectives of simplified procedure"). This Court has also previously found that an ALJ "properly determined that the record contained sufficient evidence to decide [a claimant's] disability claims absent expert medical testimony because the record

> contained [the claimant's] extensive medical history." *Williams v. Callahan*, 1998 WL 344073, at \*4 n. 3 (6th Cir. May 26, 1998).
>
> Here, the ALJ had Simpson's extensive medical history, testimony as to her daily activities, testimony from a vocational expert, and the reports from Simpson's treating physicians, as well as reports from state agency doctors. Therefore, given the breadth and depth of the evidence in the record, and this Court's deference to the ALJ in deciding whether the record is fully developed [under 20 C.F.R. § 404.1529(b)], we find the ALJ did not err in failing to call a medical expert.

344 F. App'x 181, 189 (6th Cir. 2009).

Here, more than half of the record—317 pages spanning 21 exhibits—is office treatment notes that Di Loreto submitted. (ECF No. 11, Exhibits 1F-21F, at 283-600). The record also includes Di Loreto's testimony (ECF No. 11 at 70-92), Anderson's vocational-expert testimony (ECF No. 11 at 92-97), and the State Agency physical consultants' written opinions. (ECF No. 11 at 99-108, 110-26). The record here is as complete as it was in *Simpson*; the Court is satisfied that the ALJ could rely on it in assessing Di Loreto's RFC. Accordingly, the ALJ satisfied his burden to conduct a full inquiry into the case record before assessing Di Loreto's RFC. And the ALJ did not err by not eliciting supplemental medical-opinion evidence. *See Landsaw*, 803 F.2d at 214 ("'[A] full inquiry does not require a consultative examination at government expense unless the record establishes that such an examination is *necessary* to enable the administrative law judge to make the disability decision.'") (emphasis in original) (quoting *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir.1977). Thus, Di Loreto's claim should not be remanded for lacking medical evidence or expert analysis—both were sufficient to adjudicate his claim.

## VI.    Recommendation

Because the ALJ followed proper procedures and his decision is supported by substantial

evidence, I recommend that the Commissioner's final decision denying Di Loreto's application

for disability insurance benefits be AFFIRMED.

DATED: 1/4/2020

_s/*Carmen E. Henderson*_____
Carmen E. Henderson
United States Magistrate Judge

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after being served with a copy of this document. Failure to file
objections within the specified time may waive the right to appeal the District Court's order. *See
United States* v. *Walters*, 638 F.2d 947 (6th Cir. 1981); *see also Thomas* v. *Arn*, 474 U.S. 140
(1985), reh'g denied, 474 U.S. 1111 (1986).